May it please the Court. Good morning, Your Honor. Now that you've pushed that down, could you raise it back up? Yes. Is that better, Your Honor? Yes. Well, that's maybe too better. My name is Kevin Walton, and I represent the appellants in this matter, Larry Williams and L&L Publishing. And I understand I control my own time, and I'll reserve any remaining time for rebuttal. In this case, the district court erred when it determined that there was no evidence that the parties treated the specific agreements in Richmond. Now, I understand the Court ordinarily does not need a recitation of the facts, but I think in order to understand the legal arguments here, I wanted to, as clearly as possible, based on the record, define the parties' agreement for you. And I'm going to do that as quickly as possible, and then turn to the specific arguments to understand how that applies to the arguments. Because the first and most difficult step in this case is determining what the parties' agreement was. And the easiest way to determine this, based on the record, is to look at what each party received under their quid pro quo agreement. You see, on one hand, Mr. Williams agreed to promote, or to help promote and help develop, Genesys software. He allowed Genesys to attend all of his seminars, and to sell Genesys software at those seminars. And this is where other people paid up to $10,000 to attend those seminars. He allowed Genesys to use his name and likeness. And he allowed Genesys to use and sell his libraries and their software, including, specifically, one of his sentiments that was included within the libraries, LW Sentiment. Now, in exchange for doing so, Genesys agreed to pay him one-half the revenue from the sales of one of those sentiments, LW Sentiment, and it provided him premium access to Genesys' own software, and that was the trade navigator software. And Genesys provided him with two computers, and there's some testimony in the record that they provided some programming. But what's clear is that this relationship benefited both of them. But what's equally important is to look at what happened after Mr. Williams terminated this relationship. On one hand, Genesys terminated every benefit that Mr. Williams received under that agreement. They terminated his access to trade navigator and their software. They terminated his own access to his libraries. Yes, he terminated the agreement, absolutely. But as would be expected, Genesys told Mr. Williams, once they terminated it, that they were no longer going to use his libraries or sentiments, and they told him that they would return those, and they told him they would no longer use his name and likeness. But they didn't do that. And what this case is about... Let me ask you a question on that. I was under the impression that the people that came to his seminars and who had been given access to his libraries could use those libraries forever. Absolutely, Your Honor. And the only way they could use them was on their software, whatever you call the things they had. And the first part of what you said, Your Honor, is exactly correct. The second part is incorrect. Now, if he had stopped, if Genesys had said, okay, or if Mr. Williams, I think he said, stop giving them the library, well, wouldn't that have breached his agreement with his own students? No, Your Honor, because his software, his libraries were available on several different platforms, not just Genesys' platform. That's the point. The record demonstrates that. There's another software called, I believe it was TradeSense. Bloomberg offers his libraries. So to the effect that he told them, you cannot offer my libraries on TradeNavigator, if any of his students could then contact Mr. Williams and he could activate it on any other platform. Would he tell them that? Absolutely. Is that in the record? Yes, it's in the record, Your Honor. Do you have a citation for that? Let me find exactly. I do not have the exact citation, but several different times Mr. Williams and other people in the record testified that his libraries were available on these other platforms. And one of the witnesses specifically testified that he even used some of Mr. Williams' libraries on another platform. And so that's exactly the point here, is that Genesys continued to benefit by receiving monthly subscriptions for people who paid for, for people who wanted to access Mr. Williams' libraries, when he would have been able to provide that access to people on any of these other platforms. Why does the platform matter? I thought the whole point was he had these libraries, he was providing these seminars, people were paying to come to the seminar, and once they did that, they obtained access to the libraries. And those are the libraries we're talking about, right? Are there other libraries that you're referring to? Correct. The libraries are the specific, think of it as a folder containing all of his sentiments and indicators, and those libraries are simply hosted on a platform. Mr. Williams always agreed to provide access to his libraries. But he didn't agree that, and part of the party's agreement over the 17-year agreement, and why it was so important that I wanted to go through that, was he allowed Genesys to use and make his libraries available on Genesys as part of their agreement. But as soon as he terminated that agreement, Genesys no longer had permission to use his libraries. But all the students, I thought, who had paid for access to the libraries when they went to these seminars, didn't they have use and access to these libraries forever? Yes, and on any other platform besides Genesys. So what's the harm here? Well, the harm is that it's unjust enrichment. Or rather, the unjust enrichment to Genesys as a result of the continued usage of these libraries by whomever attended seminars. Well, the unjust enrichment to Genesys is that they continue to receive monthly subscription fees, and the testimony was that people continue to subscribe to Trade Navigator, specifically to obtain Mr. Williams' libraries. And Mr. Williams received benefits from having it hosted on other platforms. And the only reason I think what's important here for the court to look at is maybe look at this in a slightly different way. And that is, how did Genesys get these libraries in the first place? Well, if I bought the library, and I had a PC that I bought from Genesys, what more did I need? I had the library, it's on my Genesys PC, whatever it is they sell. Well, I think to clarify, Your Honor, the only reason Genesys has any access to any of these libraries, any of Mr. Williams' libraries, is because of the parties' agreement. Well, I know that, but they weren't peddling that library to other people after the agreement broke up. It was just to the students, the seminar purchases. No, and I think, I disagree, Your Honor. I think the record shows that after he terminated their agreement, if you go, there's evidence in the record where specifically, I believe it's during Mr. Williams' testimony, where he's shown a screenshot that occurred after he terminated the agreements. And what it is, is it's his libraries that they're selling to new people on their site. Under the new name? Under the new name, but they changed the name of LW Sentiment, that's one. The others, they just kept selling. They put his picture right next to it and said, this is Mr. Williams, Mr. Williams created this, and you should subscribe, because we have access to his libraries. And that's what this case is about. And when we look at unjust enrichment, the only reason that they have any access to this was based on a previous agreement to pay. And that's where the Cablevision case comes into play. Well, Cablevision was totally different. And that was where they bought the service, and then canceled it and kept one line, and then they went peddling the service to all their customers. On hard wire. And I think this case is similar to that, because under the party's agreement, Genesis provided services to Mr. Williams in the same way that the defendant in Cablevision paid for it. Genesis provided him certain benefits in the same way Cable was paid for. As soon as they terminated, in Cablevision, they terminated. They terminated the Cablevision except for one connection. And then they took their own wires and ran them to the customers previously who had purchased Cablevision. Right. And here I think what they continued to do, in the same way that they continued to provide access to those customers that previously provided Cable, a critical factor in Cablevision was that it was a service they previously paid for. And the same applies here. They previously provided Mr. Williams a benefit for the exact same thing that they later continued to provide without paying him. To his students. Well, they provided the benefit to his students, but they also continued to receive the benefit from his libraries, Your Honor. So let me ask you this. Because in all your answers so far, I have yet heard any statement as to what your legal property interest is in these, quote, assets, end quote. What is your lawful property interest? I think that's where the Court looks to Cablevision. And what our argument is, is that in Cablevision, the Colorado Supreme Court explained that with intangible properties, which is what this is, if you spend the time, substantial time, effort and expense, which there's no doubt Mr. Williams testified that he spent his entire life developing these libraries, and then you have something that you previously paid, that someone previously paid for, and that that would create a property interest. And that creates the... What interest is it? It's not a copyright interest. This is not subject to be copyrighted. What kind of interest is it? It would be similar to any of your property interests, that you have the right to control and sell and dispose of your own property. Well, if I go to my house and say this is my house, I have a majority deed, I have a title, fee simple title in real estate. What title do you have? In the same way, Your Honor, that I think if you do have a house and you can take your house and tell someone, I will let you... Well, if I own a house and Paul is living with us, Judge Kelly is living with us, and then we have fisticuffs and I'd leave in a huff. He can't rent my house. Because I have title to the house. And that's basically your argument is, hey, they can't sell these services because I have title. And I'm just asking you, what title do you have? I think he has the ownership interest in this as his intangible property, Your Honor. And I think that is based on cable vision, the fact that he spent substantial time, effort and expense. And I think... So cable vision, your case rises and falls on cable vision. I think it also, partially on cable vision, but what I think it also rests on is the second argument that we made. And that is specifically this finding that there's no evidence that the parties treated this as protected. I think the parties can, based on conduct and their agreement, treat these as protected. And that would give rise to a property interest as well. And I think that here the district court erred, and we pointed out by making it... Do you have a patent on it? No. Do you have a trademark on it? No. You don't have a copyright in it? That's correct. So you don't have any of those rights. You're basing conversion based on a right, but it's not patent, trademark, copyright. That's my problem. It's not real estate. Isn't that what the district court said, basically? I don't think that's what the district court said. I think what the district, two things. Where did Judge Krieger go wrong, then? What is the error? She erred in two specific ways. One, she found that there was no evidence that the parties treated this as protected. The other, she found that the parties treated it as a legal obligation. You can use the sentiment so long as you pay for it. The converse must be true. If you don't pay for it, you can't use it. We believe the district court erred in ignoring that finding. Unless the court has any other questions, I'll reserve the remaining time for rebuttal. My name is Scott Johnson. I'd like to go straight to a misapprehension and a misdescription of the products that we're talking about. Libraries can be found, an example of the formulas that are in the libraries, that are in the manuals, can be found at page two of our response brief. Think of a CLE that you go to, and they give you literally a notebook, and in the back of it are a number of helpful maybe case sites or forms. And they have a big C on the bottom, right? A little circle? The manual, I believe, does have copyrights as such, the manual. The formulas themselves do not. The libraries are a series of formulas that are presented in a manual and taught by Mr. Williams at seminars to people who pay thousands of dollars to fly in and hear Mr. Williams talk about how these relate to stock trading. And he's very good at it. And I think you could well understand that he would think, hey, this is my stuff. These ideas are mine. I control them. I developed them. I conceived them. They're almost like my children. This is my hard-worked life's product, and now these guys come over here and pick it up. Well, no, it's not as unfair. And use my name and kick us around. Isn't that kind of in the vernacular of their claim? Well, I'm going to start with the idea, if I may, Your Honor. He does think the ideas are his ideas, his children. He controls them.  Well, wait a second. It can be recognized in the law. If legal steps are taken to either patent them or trademark them or copyright them or something. Yes, but pure ideas are ordinarily not recognized as a property right. That's what the trial court said. That's what the law says. What's the name of the case? Cablevision? I think one of your honors mentioned that the Cablevision just doesn't have any relationship to this. Cablevision was a case that got tried up in Summit County, and somebody was ripping off the cable signal. They had 25 subscriptions. They dropped down to three, and then they connected something like 50 more customers. It went to the trial court on a stipulated contract claim. The trial judge decided that it was a conversion. The court of appeals said, hey, that wasn't the stipulated issue that you, the trial judge, had in front of you. And the Supreme Court said, no, wait a minute, it was a contract claim, express or implied, and we think there's enough there to support an implied contract. And they reversed the court of appeals and reinstated the judgment. So Cablevision doesn't come anywhere close to our facts. But if I can go back to, quickly, the library, Your Honor, there's an example of a seminar manual at Exhibit 599, an admitted exhibit, given to everybody. Say that again. Exhibit 599, Your Honor. Right. So you go to the seminar, you get the manual. In the middle or the back of the manual are all these formulas. And all those formulas in each seminar, and they would be different, those are the libraries. Sentiment is not a library formula. Sentiment is a standalone product that attempts to correlate public sentiment with respect to a given public sentiment about stocks and futures. And it essentially says, when the public thinks things are going well, they're not. And the public always gets it wrong, is the sentiment point. Genesis had a sentiment, Williams had a sentiment. After they began this relationship, they came together, and Genesis, through Mr. Larson, said to Larry Williams, hey, let's combine our products, and we'll sell our futures and your stock, and we'll sell these for $25, $35 a month, depending on whether it was combined or separate. And Mr. Larson said, you can have all the money. And Mr. Williams said, no, let's split it. Split the gross revenue for LW sentiment. And the moral of the story is they should have gone to a lawyer and put it in writing, correct? A judge to call these people's relationship loose would be probably a promotion. That was the only contract they entered into in their entire term, and it was an oral contract. Every other thing was symbiotic beneficial behavior, but without any structure or sufficient terms, I would say, to be a contract. So we had one contract claim tried to this jury, and it was the LW sentiment contract, the agreement to share 50% of the revenues. And it was a joint product. It was a joint product. Each had his own, and then they came together, and they worked on it, and they developed what became LW sentiment. And they probably refined it over time, but undisputedly, they both contributed to it. Sort of like two college kids in a classroom getting together and inventing a product, and then next, voila, they're millionaires. Well, Mr. Larson testified that he did this. And then, voila, they get in an argument, and one of them runs off with a product and says it's mine. Is that this case? No, sir. Genesis had a perpetual obligation to share the revenues from the sale of sentiment. So so long as Genesis was selling sentiment, whether it was called TN Consensus or LW Sentiment, TN Consensus was to get Larry Williams' name out of the product because he said get my name out of the product. But so long as that product was being sold, there was a 50% revenue share requirement, and the damages presented at trial took that into account. What about future sales? Future sales on sentiment? Yes. There was a contract to share those revenues. There was no end on it. Was that where the $357,000-plus came from? That is the sentiment contract claim. Plus the $57,000 that the district court added to it. $57,000. I'm going to break that down in three pieces if I may, Judge. $358,000 was an email written by Glenn Larson to Larry Williams. Larry Williams said, how much do you owe me? I think you haven't been paying me on sentiment. And so Glenn Larson sent Larry Williams an email, and he said, we've sold total sentiment $499,000. I've paid you $144,000. The net remaining due to you is $358,000. That's what I owe you on sentiment. But remember, Mr. Williams, remember, Larry, we had this deal that we would write yet another product called Indicator Analyst, a different measuring tool, and we would use the revenue from that to pay what we owe you on sentiment. And that blew up the people's, the party's relationship. And Mr. Williams denied that. Williams denied that, and he got angry, and things deteriorated rapidly, and he terminated within a month and a half. But the contract issue is not at issue on appeal, right? We're talking about unjust enrichment. Right. We're talking about unjust enrichment for continuing to provide the libraries to the students who paid for them. Now, were they selling that to other people that were not previous students? No. Genesis always denied that. To your point, the judge did actually award some money under the moniker of data fees, and she said Genesis denies that they've sold the libraries or they've gotten any new people who didn't pay for the libraries, and they're giving those out. Genesis denies that. But I'm going to assume that it happened a few times, and I'm going to say 10 times arbitrarily, this is her word, and I'm going to multiply that times $35 times five and a half years, and that's 23. I mean, the judge was scraping around for evidence of damage because there wasn't any. You're not contesting that? That award? No, sir. It was her attempt, and she said very clearly, look, for those students who continue to get the seminar libraries in the trade navigator platform, and it's kind of like when you watch the Scott trade ad, you know, the guy types something in and you get all these fancy graphs, mainly I think for day traders, people who are really actively involved in this, for those people to continue, she did not find it inequitable for them to continue to have access to those libraries, which they paid for, via trade navigator. She said, look, that's the agreement that, you know, that's the arrangement Larry Williams made. Those people already paid for it, they get it in trade navigator. Parenthetically, they could have typed it in themselves, but we did it for them. But she did say, if there were people who came to trade navigator after the termination who were given the libraries, then that would be some unjust enrichment, and I'm going to look for a measure to award some damages. Now, there was no evidence of that. So, as I said, and as she says in her order, she arbitrarily determined ten people times $35 times five and a half years. Was there any evidence that the students were all told they could get their libraries off another platform? The libraries can be, it would be difficult, but. Were they told that? Yes. Rather than use Genesis, you can keep your library if you get another, a different platform. Yeah, they were theirs. The only difficulty, Judge, is that those libraries are rewritten in what's called trade sense, which is a Genesis proprietary language. So I think, though they are hypothetically usable, let's say in Trade Station or Scottrade, I don't really know that they do that, but you would have to back it out and follow their trade language. But theoretically, the students could do anything with them, because they had the physical copy. Okay. Now, are you still splitting that money with Mr. Williams? There was no money, Judge. Genesis was providing those libraries to the students at no cost to the students. Well, but were they being paid for Genesis? Well, they're subscribers to Genesis, just like you're a Cablevision subscriber, perhaps. But they didn't get any extra money for doing this. Could they get other stuff off the platform other than the Williams material? Did the students? Yeah. Let me see if I can answer that. They would go to a seminar. They'd get the manual. Genesis would help present. It would be mentioned that Trade Navigator was an excellent platform, and you can, by the way, your library will be available in Trade Navigator if you're a subscriber. Now, is it just the stuff that existed up to the time of the split? I'm sorry, what, Judge? The materials that they're getting, was it just up to the time of the split, or are they getting updates of the Williams idea or sentiments, whatever you call them? I don't know of an update. I think there were lots of additional seminars, but more often than not, people such as Mr. Williams don't want to just update a prior seminar. They want to sell either new material or radically new material just for the value proposition. Do you claim any property interest in the remaining information? Does Genesis claim a property interest in the libraries? Yes. No, sir. What are you selling then to new customers, if anything, that involves Williams? Well, our evidence was we're not selling anything to those new customers. I think the trial judge Your contention is you're receiving no revenue whatsoever related to your previous business conduct with Williams. Except insofar as people continue to be customers and pay us our monthly trade navigator. For the same services that you were selling before? Yes, but Judge, this is a... Well, that's what I'm saying. I just want to know if you claim a property interest in that continuing service that you're providing. No, we don't claim a property interest. We did, however, say we will not cut those people off. We promised them they could get these libraries for free through Trade Navigator. You promised them that and we will not cut them off. And Mr. Williams wants to... So you're not making any money at all from this previous business conduct with Williams? Only insofar as they remain customers, I guess. Well, if they remain customers, you're getting revenue, right? But it's not the only thing on Trade Navigator, Your Honor. I understand, but you're providing other services. Well, not just a little. It's like the golf channel compared to the other 300 channels you get. It's a small fraction of what people can do in Trade Navigator. If they stay with the company with Genesis because solely of that, A, there was, I think, only one gentleman testified to that. That would just be entirely speculative as to how many people pay us a subscription fee, stay with our company only because of Larry Williams' libraries. That's just impossible to say. Well, you're not able to get any updated libraries, are you? No. So the libraries they get are the ones they got when they signed up for the course. Correct. They're static. Just two other quick comments. The trial judge did her level best to come up with some sort of compensation she felt was fair. She did say that the plaintiff's damage evidence, this is charitable, was imprecise. And she said the jury's advisory award was unreliable. And that is a polite description of both of those. Dismissal of the conversion claim was proper. The judge said you can't convert a copy of something. She did invite counsel in that colloquy to clarify if there was anything else about their allegation, you know, other than that they were claiming that we had converted a copy and counsel did not clarify in the manner that appellate counsel is now clarifying. And the verdict, just draw your attention to the title of the verdict. The contract claim is actually labeled breach of contract parent LW sentiment. I mean, it was very clear that that's what that sentiment contract, that freestanding only deal they made was in the contract claim. Last point, they had no arrangement for post termination. None. Mr. Williams was asked that and he said, asked about the name. He said, well, you know, I made that commitment when we were in love and we didn't have any agreement for what happened after that. Yes, thank you judges. Judge Lucero, I wanted to start briefly by addressing a question you asked. The money that Genesis receives is in the form of monthly data payments. And if the court looks to the record at volume 8, page 1414 line 17 through 1415 line 3, there's a specific customer who is still providing, who's still paying Genesis monthly subscription fees. And he said he's solely doing that to obtain Mr. Williams' libraries. And that if he didn't have access to those, he would go to a different platform. The second point that... How many of those are there and is it quantified? Was there an exhibit that was introduced as an expert call to testify as to your damages on that point? I don't believe so, Your Honor, but I think that's why this court needs to remand back to the district court to allow the district court to consider that and properly consider those claims. I see, unless the court has any other questions, I would ask this court remand to the district court with instructions that the district court can properly consider the evidence and also reverse the district court's dismissal of the conversion claim as a matter of law. Thank you, Your Honors. Thank you.